IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**CHARLES WILLIAM BURTON,**
**Plaintiff,**

-vs-                                                                        Case No.  A-09-CA-532-SS

**UNUM LIFE INSURANCE COMPANY OF AMERICA,**
**Defendant.**
_____

# O R D E R

BE IT REMEMBERED on May 25, 2010 the Court held a hearing in the above-styled cause, and the parties appeared in person and through counsel.  Now before the Court are the Plaintiff Charles William Burton ("Burton")'s Sealed Trial Brief [#14], the Sealed Administrative Record ("AR") [#15], Defendant Unum Life Insurance Company of America ("Unum")'s Sealed Trial Brief with Appendix in Support [#16], Burton's Sealed Response Brief [#18], and Unum's Sealed Response Brief [#19].  Having considered the foregoing documents, the case file as a whole, and the applicable law, the Court enters the following opinion and orders.

## Background

This is a lawsuit governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*.  Burton sues Unum under §1132(a)(1)(B) of ERISA to recover benefits due under a Long Term Disability Insurance policy (the "Policy") issued by Unum.  Pl.'s Compl. [#1] at ¶ 3. He also seeks to enforce his rights under the terms of the Policy, and to clarify his rights to future benefits under the Policy.  *Id.*

In February 2004, Burton was a partner at a national law firm in Houston, Texas.  He had been practicing law for some 30 years, and had had an "extraordinary life and career."  AR 132.  Among other things, he had worked for the Clinton administration, and had achieved the highest score on both the

Texas and the Arkansas bar exams. *Id.* But in February 2004 he had recently divorced (in October 2003), and was suffering from depression. AR 475. Therefore, his psychotherapist referred him to Dr. Kathleen Gallentine, a psychiatrist, in order for her to evaluate the efficacy of his current medication. *Id.* The psychotherapist questioned "the efficacy of the antidepressant and if a change might be indicated," and noted Burton had recently been divorced and had a family history of mental illness. *Id.*

Dr. Gallentine initially prescribed antidepressant medication for Burton. In March 2004, she wrote that Burton should be carefully watched for manic behavior, as "suspicion for bipolar spectrum illness is high." AR 473. In April 2004, Dr. Gallentine prescribed Depakote, a medication used to treat the manic phase of bipolar illness. In May 2004, she increased Burton's dosage of Depakote twice. AR 470. She noted Burton used to bill 2,000 hours per year at his job, but "since the divorce his billing is really low." *Id.* (emphasis in original). She noted he was living dangerously and recklessly, but did not quite seem to know why. AR 469.

By July 2004, Burton had informed Dr. Gallentine he would no longer be taking mood-stabilizing medication. She discussed the consequences of not taking medication, and presented various other medication options to him, which he rejected. AR 460. Burton returned to Dr. Gallentine shortly thereafter looking, as she wrote, "slightly disheveled." AR 459. He said he had not been sleeping regularly, and was having difficulty controlling his mood. *Id.* Dr. Gallentine stated in her notes: "We discussed possible outcomes of untreated bipolar disorder both further mania vs. depression. We discussed options at length. He continues to refuse mood stabilizers. Only wants Ambien." *Id.* Dr. Gallentine's treatment of Burton ended on September 24, 2004. AR 236.

On January 1, 2005, Burton started a job in the Austin, Texas office of Baker Botts, another national law firm. He was hired at a salary of $800,000 per year in 2005, but billed almost no hours that year. In 2006, he billed only 200 hours total. AR 132. By 2007, Baker Botts had reduced his salary to

$600,000; according to Burton, he was totally unable to work by that point. *Id.* Burton resigned from Baker Botts effective March 31, 2007. AR 193.

In February 2008, Burton applied for Long Term Disability benefits with Unum, claiming disability due to his bipolar disorder. Burton identified two doctors with whom he was currently treating: Joe Wakefield, a psychiatrist, and Teresa Coats, an internist. AR 22. Dr. Coats filled out an attending physician's statement which accompanied Burton's claim, identifying the disability as "bipolar disorder," and describing the symptoms as "inability to focus, complete tasks, engaging in dangerous activities, withdrawing from contacts." AR 23. She noted Burton had been treated for bipolar disorder in 2003 and 2004 by a psychiatrist in Houston. AR 23. As to cognitive deficits, she noted "Pt. has lost the ability to stay on task and complete even simple tasks—he is disorganized in this thought processes," and suggested "he should not make major financial decisions or life decisions." AR 24.

Dr. Coats had started treating Burton on February 8, 2005, although she was treating him only for his cardiovascular condition at that time. AR 342. The last time she saw Burton before he resigned was on April 12, 2007, for medication refills. Dr. Coats did not document any psychiatric complaints or concerns at that appointment, nor did she note any psychiatric dysfunction at that visit. AR 537, 579-80. In fact, Dr. Coats reported she first became concerned about his psychiatric decompensation when he called her on February 7, 2008 and stated he was considering stopping all his cardiac medications (at which point she referred him to Dr. Wakefield for psychiatric evaluation). AR 798, 558. In her statement, she states the date of Burton's first visit to her expressly dealing with his bipolar disorder was on February 12, 2008. AR 23. At that appointment, he appeared markedly disordered and was not completely

coherent.  AR 558.  On March 3, 2008, she noted in her records that Burton had "stopped all meds" and has "Bipolar disorder."  AR 561.[1]  She wrote she "advised at length" to "consider meds."  *Id.*

Dr. Wakefield first saw Burton on February 11, 2008, when Dr. Coats referred Burton to him out of concern "that Mr. Burton's active bipolar disorder was interfering with her prescribing treatment for his cardiovascular condition."  AR 518.  He saw Burton for "diagnosis and treatment of his psychiatric condition[.]"  AR 517-19.  Dr. Wakefield met with Burton 12 times over the next two months.  On April 10, 2008, Burton had a manic episode and was hospitalized at Austin Lakes Hospital, and thereafter discharged on medication.  AR 518-19.  Dr. Wakefield continued to meet with Burton for psychotherapy, and noted Burton is taking lithium.  AR 519.

On February 27, 2008, after Burton had filed his claim for benefits, an Unum disability benefits specialist called him to discuss it.  According to the specialist's notes of the conversation, Burton explained he had had his "condition" since childhood, but had to stop practicing law because "[h]is judgment was impaired," and "in good faith [he] could not go on."  AR 132.  He stated he had started seeing a psychiatrist in Houston in 2004 (Dr. Gallentine), but had last seen her in September 2004.  AR 132-33.  He stated he "treated actively with full on meds" while at his Houston job, but after leaving his job in Houston, he did not seek treatment because "he knew he needed to be untreated so would not be a pre[existing] condition."  AR 132.  The specialist also noted Burton had "stopped all medicine he thinks due to bi-polar [disorder].  AP's say that is consistent w[ith] bi-polar.  [He] even canceled all insurances."  AR 133.  The specialist later noted that Burton claimed he "did not want to see psych provider because [he] was in denial against bi-polar disease and refused to seek treatment" after his move to Austin.  AR 135.  Burton admitted no doctor had ever told him to stop working, he just felt he "could not do it any

---

[1]The records of this appointment were mislabeled in Dr. Coats's files, such that it appeared the appointment took place on March 3, 2007.  However, upon being contacted by Unum's psychiatrist, Dr. Coats confirmed the appointment had actually taken place on March 3, 2008.

more." *Id.* He said Baker Botts had asked for his resignation and agreed to pay him through March 2007, and he agreed. *Id.*

In May 2008, Burton's file was referred to Dr. Kletti, an in-house Unum psychiatrist. Dr. Kletti completed his review on June 19, 2008. AR 529-34. He concluded:

> I do not find that the file documentation supports that claimant went out of work due to psychiatric impairment. Claimant has stated that his psychiatric condition was active and impairing for years prior to [last day worked.]... Claimant then goes out of work after March 31, 2007. On April 12, 2007 he was seen by internist Dr. Coats who makes no mention of any psychiatric symptoms, complaints, concerns, diagnoses, treatment or impairment. There is subsequently no documentation of any care until Feb. 2008 at which time Dr. Coats certifies psychiatric impairment with 1st visit for the condition being Feb. 12, 2008.

AR 534-35. Dr. Kletti concluded, "It appears likely that [Burton] became psychiatrically impaired by Feb. 2008. However, I do not find the file documentation to support he went out of work in spring 2007 due to psychiatric impairment." AR 536.

Unum denied Burton's claim for long-term disability benefits on July 17, 2008. AR 578. In the letter informing Burton of its decision, Unum set forth the reasons for its decision as follows:

> [W]e have opined that as of your last day worked, there is no physician supporting impairment from a bi-polar condition that would preclude you from performing the material and substantial duties of your occupation. Nor did you treat with any provider for a psychiatric condition on or around your last day worked that would even indicate that you were suffering from a bi-polar condition. Although Dr. Coats has supported impairments as of February, 2008, you were no longer covered under this policy as of the effective date of your separation agreement from your employer as indicated below. Therefore, no benefits are payable and we will be closing your claim.

AR 580.

In September 2008, the Social Security Administration (the "SSA") determined Burton was totally disabled from any gainful activity due to bipolar disorder as of his last day at Baker Botts. AR 689. Burton filed an administrative appeal of Unum's denial of long term disability benefits to the designated fiduciary of the Policy, supplementing the record with his entire Social Security file. AR 783. Burton's

appeal was based primarily on the arguments his not taking medicine or seeing doctors was a symptom of his bipolar disorder and that Unum was required to follow the SSA's determination that Burton was totally disabled due to bipolar disorder as of his last day worked.

Unum had Dr. Peter Brown, a psychiatrist, review the records and determine whether Burton was functionally impaired due to a behavioral health condition from March 31, 2007 through March 29, 2009 and beyond.  Dr. Brown determined:

> No, not for the full time frame.  There are no records or other information supporting the presence of significant sustained psychiatric impairment for the time frame 2/31/07-02/07/08.  There are records supporting the presence of sustained psychiatric impairment from 2/07/08 forward consistent with acute onset 02/08.  However, no reasonable clinical inferences can be drawn regarding the prior time frame because of the fluctuating nature of bipolar disorder.  While bipolar affective disorder may be a lifetime condition, as the name indicates it is characteristically phasic in nature with inter-episode return to baseline in most cases.  Inter-episode treatment is prophylactic ...  It is possible that from the time that he stopped treatment 09/04 until he reported symptoms in February 2008 that the claimant (as a prudent person/someone who is knowledgeable about the disorder, as evidenced by extended discussions about the diagnosis with his original psychiatrist and per documentation of his voluminous reading about the disorder) that the claimant should have sought treatment but chose not to.  However, as noted, there is no contemporaneous evidence of significant symptoms or impairment at any point.

AR 920.

Burton's administrative appeal was denied on March 17, 2009.  AR 928.  The denial letter sent to Burton set forth in detail Unum's reasons for denying his claim.  *Id.*  The letter stated Dr. Coats had not identified in Burton any significant symptoms or impairment from a psychiatric condition until February 7, 2008, and that Dr. Brown, a board-certified psychiatrist, agreed there was "no medical evidence to support the presence of significant sustained psychiatric impairment" until February 7, 2008.  AR 930.  Unum acknowledged in the letter that Burton was receiving Social Security disability benefits, and stated it had given significant weight to the SSA's determination.  AR 931.  However, Unum stated it ultimately determined he was not "disabled" under the terms of the Policy—*i.e.*, unable to perform the material and

substantial duties of his occupation as an attorney—on March 31, 2007 because he was not being treated for his behavioral health condition at the time of his resignation, and had not been advised by any treatment provider not to work due to his condition. *Id.* Unum stated its Policy "contains a regular care provision which Social Security does not," and Burton had not been in regular care for his behavioral health condition from September 2004 to February 2008. *Id.*

Based on this denial, Burton sued Unum in this Court under the civil enforcement provisions of ERISA, specifically 29 U.S.C. § 1132(a)(1)(B), in order to recover long term disability benefits, enforce his rights under the terms of the Policy, and clarify his rights to future benefits. Orig. Compl. at ¶ 3. Burton claims disability as of March 31, 2007, the date he resigned from Baker Botts. The parties filed the administrative record with the Court, and agreed this case may be determined on the basis of the administrative record. Both parties have submitted written briefs. The Court construes the filing of these briefs as cross motions for summary judgment and applies the relevant standard below.

### Analysis

### I.      Summary Judgment Standard

Summary judgment may be granted if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding summary judgment, the Court construes all facts and inferences in the light most favorable to the nonmoving party. *Richter v. Merchs. Fast Motor Lines, Inc.*, 83 F.3d 96, 98 (5th Cir. 1996). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990).

Both parties bear burdens of production in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The moving party has the initial burden of showing there is no genuine

issue of any material fact and judgment should be entered as a matter of law.  FED. R. CIV. P. 56(c);

*Celotex*, 477 U.S. at 322–23; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The

nonmoving party must then come forward with competent evidentiary materials establishing a genuine

fact issue for trial, and may not rest upon mere allegations or denials of its pleadings.  *Anderson*, 477 U.S.

at 256–57; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  Neither

"conclusory allegations" nor "unsubstantiated assertions" will satisfy the non-movant's burden.  *Wallace*

*v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

## II.     ERISA Standard of Review

ERISA permits a person denied benefits under an employee benefit plan to challenge that denial

in federal court.  *See* 29 U.S.C. § 1132(a)(1)(B); *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2346

(2008).  The standard of review for an administrator's denial of benefits under an ERISA plan is governed

by the Supreme Court's decision in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), and the

Fifth Circuit's subsequent decision clarifying and applying *Firestone* in *Pierre v. Connecticut General*

*Life Ins. Co.*, 932 F.2d 1552 (5th Cir. 1991).  *See Vercher v. Alexander & Alexander, Inc.*, 379 F.3d 222,

226 (5th Cir. 2004).  Review of the administrator's denial of benefits is *de novo*, unless the benefit plan

gives the administrator discretionary authority to determine eligibility for benefits.  *Firestone*, 489 U.S.

at 115.  The Policy in this case includes an express grant of discretion to Unum to make claim decisions.

AR 95.  Thus, the standard of review is for an abuse of discretion, both in interpreting the policy and in

denying the claim.  *See Glenn*, 128 S.Ct. at 2348.

A plan administrator abuses its discretion "where the decision is not 'based on evidence, even if

disputable, that clearly supports the basis for its denial.'"  *Holland v. Int'l Paper Co. Retirement Plan*, 576

F.3d 240, 247 (5th Cir. 2009) (quoting *Lain v. Unum Life Ins. Co.*, 279 F.3d 337, 342 (5th Cir. 2002)).

Courts find an abuse of discretion only where the administrator acts "arbitrarily or capriciously."

*Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 214 (5th Cir. 1999).  "A decision is arbitrary only if made without a rational connection between the known facts and the decision."  *Id.* at 215.

In determining whether an administrator has abused its discretion, one factor is whether the administrator operates under a conflict of interest.  *Glenn*, 128 S.Ct. at 2346-48.  In the present case, it is undisputed Unum both determines whether Burton is eligible for benefits and pays for benefits out of its own pocket.  The Supreme Court of the United States has determined "this dual role creates a conflict of interest," such that a reviewing court "should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits," although the significance of the factor will depend upon the circumstances of the particular case.  *Id.*  Specifically:

> The conflict of interest at issue...should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.  It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id.* at 2351; *and see Holland*, 576 F.3d at 248-49.  Because Unum undisputedly funds the Plan and also determines eligibility for benefits, a structural conflict of interest exists in this case under *Glenn*.  *See* 128 S.Ct. at 2348.

**III.    Discussion**

There is no argument between the parties regarding the language of the Policy, and specifically the portion entitled "How Does Unum Define Disability?", which reads:

> You are disabled when Unum determines that:
> - you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury;

> - you have a 20% or more loss in your indexed monthly earnings due to the same
> sickness or injury.
> You must be under the regular care of a physician in order to be considered disabled.[2]

AR 75.

Unum claims it made a factual determination that Burton was not disabled under the terms of the Policy at the time of his resignation based on the following factors: (1) there is no evidence he was being treated for bipolar disorder (or any other disabling disorder) immediately before, during or after the period from October 2006 (the date he allegedly stopped working due to disability) to March 2007 (the date he resigned); (2) although Burton was apparently diagnosed with bipolar disorder in 2004, the next time he consulted with *any* physician about a psychiatric problem was in February 2008, when he asked his Dr. Coats to fill out his Unum disability claim; (3) both Unum psychiatrists concluded independently the record did not support Burton's claim of disability; and (4) neither of Burton's current treating physicians (Wakefield or Coats) have ever opined he was unable to work on or around March 2007 due to bipolar disorder.[3] Unum also explains it did not follow the Social Security Administration (SSA)'s determination because nothing indicates the SSA requires a claimant be under the regular care of a physician, as the Policy does.

As stated above, both Unum's factual determination that Burton was not disabled in March 2007 and its interpretation of the Policy as requiring Burton be under the "regular care of a physician" in order

---

[2]The Policy defines "regular care" to mean "you personally visit a physician as frequently as is medically required...to effectively manage and treat your disabling condition(s); and you are receiving the most appropriate treatment and care...for your disabling condition(s) by a physician whose specialty or experience is the most appropriate for your disabling condition(s)[.]" AR 99.

[3]The only physician to even arguably opine Burton was disabled as of March 31, 2007 is Dr. Charles Lankford, who assessed his medical records in September 2008 on referral for his Social Security claim. Unum claims even Dr. Lankford did not make a clear finding Burton was disabled on March 31, 2007 or earlier, Def.'s Resp. Brief at 8, a point that is discussed *infra*.

-10-

to be disabled are both subject to review by this Court for abuse of discretion.  The review is limited to the administrative record; the Court must determine whether the "record adequately supports the administrator's decision." *Vega v. Nat'l Life Ins. Serv. Co.*, 188 F.3d 287 (5th Cir. 1999).  The Fifth Circuit has stated the district court's "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end." *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007).  Burton makes the following arguments in support of his claim Unum abused its discretion in his case.

### A.      Physician support for disability

First, Burton argues "[t]here is physician support for impairment from bipolar condition that would prevent Burton from performing the material and substantial duties of his occupation as of his last day worked." Pl.'s Brief at 5.  His basis for this assertion is Dr. Gallentine's diagnosis of bipolar disorder "as early as March 29, 2004," and the corresponding fact there is no "cure" for bipolar disorder—only treatment and management.  *Id.*  He claims because he stopped taking all medication in July 2004 and stopped all treatment in September 2004, it could be expected his condition would progress.  Furthermore, he claims he was assessed by Dr. Charles Lankford for the purposes of his Social Security disability claim, and was found to have been totally disabled from any gainful activity as of March 31, 2007 (his last day worked).  Although Dr. Lankford admittedly did not assess him until September 2008, Burton argues it is perfectly allowable for a claimant to establish impairment retroactively.[4]

As for Burton's first argument, the fact Dr. Gallentine diagnosed Burton with bipolar disorder in 2004 is unavailing.  It is undisputed by all parties that a diagnosis of bipolar disorder is not equivalent to

---

[4]Using medical tests and records to retroactively establish a date of disability is a perfectly routine practice in the Social Security context.

a diagnosis that one is unable to perform the material and substantial duties of one's regular occupation. In other words, bipolar disorder is not necessarily disabling, and it is undisputed Burton worked effectively at times even while afflicted with the disorder.  In fact, Burton himself explained to a Unum disability benefits specialist he had had his "condition" since childhood, AR 132, but he undisputedly had a long and productive career.[5]  Thus, the mere fact Dr. Gallentine identified Burton as bipolar does not mean she identified him as someone who was unable to perform the material and substantial duties of his occupation (in fact, it is undisputed that at the time he saw Dr. Gallentine he *was* able to perform the duties of his job).

Likewise, Dr. Lankford's assessment of Burton in September 2008 for the purposes of his Social Security disability claim is also not conclusive evidence Burton was unable to work as of March 2007. First, Dr. Lankford's own notes are inconclusive; nowhere in the notes does he specifically opine Burton was disabled as of his date of resignation (or any time before).  AR 672-84.  In fact, Dr. Lankford's written consultation notes focus far more on events that took place in 2008, such as Burton's hospitalization in April 2008.  AR 684.  Although Dr. Lankford does note Burton's first documented bipolar symptoms appeared in 2004, and Burton showed "increased irrational behavior" until February 2008, he does not make any notes specifically concerning Burton's condition in late 2006 or early 2007.  *Id.*

Furthermore, even if the Court assumes Dr. Lankford did unequivocally find Burton disabled as of March 31, 2007 (a proposition for which there is no clear support in the record, but which Burton appears to believe), and even if Dr. Lankford could by some stretch of the imagination be considered Burton's treating physician, Unum was still entitled to rely on its own psychiatrists' assessments over Dr.

_____

[5]Nurse Karen York, a Unum employee who studied Burton's records, also found they were "consistent with a long-standing history of Bipolar Disorder dating back to childhood."  AR 812. However, she noted "[t]he claimant was apparently able to function for extended periods of time in spite of his mental illness[.]"  AR 812.

Lankford's.  The Supreme Court has specifically held plan administrators do not have to "accord special deference to the opinions of treating physicians[,]" nor is there "a heightened burden of explanation on administrators when they reject a treating physician's opinion."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003).  Thus, a plan administrator does not abuse its discretion solely because "it relies on the medical opinion of a consulting physician whose opinion conflicts with the claimant's treating physician."  *Gothard v. Metropolitan Life Ins. Co.*, 491 F.3d 246, 249-250 (5th Cir. 2007).

In this case, it is highly doubtful Dr. Lankford could be considered Burton's "treating physician," as there is no evidence Dr. Lankford ever even examined Burton personally.  However, even if he could be so considered, Unum was entitled to rely on the opinions of its own psychiatrists and of Burton's other doctors—none of whom opined he was disabled on or around the relevant date—in deciding to deny Burton's clam.  "The law requires only that substantial evidence support [Unum]'s decisions, including those to deny or to terminate benefits, not that substantial evidence (or, for that matter, even a preponderance) exists to support [Burton]'s claim of disability."  *See Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004).

   **B.     Decision of Social Security Administration**

Burton also argues Unum's rejection of his claim was an abuse of discretion because its claim manual requires it to accept the conclusions of the SSA.  Pl.'s Brief at 10.  But this assertion is also without merit.  Unum's claim manual states it will "give significant weight to the SSA's determination a claimant is disabled ***unless*** there is compelling evidence the SSA decision is: (1) based on an error of law or abuse of discretion; (2) inconsistent with applicable medical evidence; or (3) inconsistent with the definition of disability contained in the Insurance policy."  Pl.'s Brief at Ex. A (emphasis in original).  If neither of the three aforementioned factors apply, the manual directs Unum "will give the SSA disability

-13-

award significant weight and will agree with the award *unless* (4) there is other evidence that clearly shows that the claimant is not disabled."  *Id.* (emphasis in original).

Unum states the SSA decision in this case is inconsistent with the definition of disability in the Policy, as the SSA does not have any requirement the claimant must be under the "regular care" of a physician (as defined in note 2, *supra*) to be considered "disabled."  Therefore, Unum claims it was not required to give the SSA's determination substantial weight under the terms of its Claims Manual.

Burton concedes he was not under "regular care" for his condition in March 2007, but claims Unum cannot use this as a factor for determining he was not disabled because his failure to treat with a provider was a *symptom* of his condition.  Pl.'s Brief at 7.  This is an interesting argument, but one which is ultimately unavailing.  First of all, Dr. Brown (a Unum physician) specifically noted bipolar disorder is "phasic," and thus it is very possible the fact Burton was not getting treated simply means the condition was not disabling at the time—in other words, his opinion was that the failure to treat was not necessarily a symptom of bi-polar disorder.  Although a Unum nurse did also make a general note that "[n]on-compliance with treatment is typical in those with Bipolar Disorder and seems to be part of their illness,"[6] AR 813, there is substantial evidence in the administrative record to support Dr. Brown's opinion that Burton stopped seeing Dr. Gallentine in 2004 because he felt better, and felt the move to Austin would improve his condition, not because it was worsening.[7]  He stated he wanted to get off the medication

_____

[6]Nurse York's full quote is as follows: "Non-compliance with treatment is typical in those with Bipolar Disorder and seems to be part of their illness, as depending on whether one is in the manic state or the depressive state, they may exhibit poor judgment and may not perceive the need for ongoing psychiatric monitoring or treatment, sometimes due to the side effects of the medications or just a matter of preference."  AR 813.

[7]For instance, Unum cites the following: Dr. Gallentine first saw Burton in March 2004.  By April 27, 2004, he reported he was not depressed at all.  AR 471.  On May 11, 2004 he reported he was doing "pretty well" and "work has been more demanding [and] that he was being very productive."  AR 470.  By June 2004, he stated his mood had been normal and good for weeks, and he wanted off of his

(except for Ambien) because of its sexual side effects and because he felt better when off it.  *See, e.g.* AR 467.  He was knowledgeable about the implications of this decision, as the record reflects Dr. Gallentine repeatedly discussed with him the possible consequences of getting off his medication, and the need to observe himself very carefully as he tapered off.  *See, e.g.* AR 467, 459, 460.  Thus, the Court finds there is substantial evidence in the administrative record to support Dr. Brown's (and ultimately Unum's) opinion that Burton's decision not to make medication or seek treatment after September 2004 was not a "symptom" of his bipolar disorder, but was simply an informed decision he made because of the undesirable side effects of the medication and because he felt he no longer needed it.

Secondly, the Policy language clearly states a claimant must be under the regular care of a physician to be considered disabled, and Unum's interpretation of the Policy as requiring this—regardless of whether the claimant's failure to treat is a symptom of his disease—is not by any means an unreasonable one.[8]  Thus, the Court finds Unum did not abuse its discretion simply because it made a determination, contrary to the SSA's, to deny Burton long-term disability benefits.

---

medication because of its sexual side effects.  AR 467.  In July 2004, he noted he was unhappy with his current job, and wanted to re-examine his career.  AR 465.  By July 20, he reported the "last week was best week of his life," as he had stopped his medication and "got so much work done he'd been amazed."  AR 460.  On July 26 he reported that taking no medications aside from Ambien made him feel better—he reported he was "getting a lot done [and] feeling good."  AR 457.  In August, he reported he was "busy and productive and accomplishing a lot," and expressed a desire to move to Austin full time.  AR 454-55.  When he last saw Dr. Gallentine, he reported he was sleeping well and handling things well, and was stopping therapy because he was moving to Austin and changing firms.  AR 452.

[8]In a side note, Burton also argues Unum cannot rely on the "regular care" requirement on appeal because it did not do so at the administrative level.  Pl.'s Resp. Brief at 3-4.  But the Court disagrees.  In its initial denial, Unum wrote "we have opined that as of your last day worked, there is no physician supporting impairment from a bi-polar condition that would preclude you from performing the material and substantial duties of your occupation.  *Nor did you treat with any provider for a psychiatric condition on or around your last day worked that would even indicate that you were suffering from a bi-polar condition.*"  AR 580 (emphasis added).  Thus, it appears Unum considered Burton's failure to treat for the psychiatric condition in question on or around the date of his alleged disability as a factor in making its initial determination Burton was not disabled.

-15-

C.      **Failure to Treat**

Burton also argues vehemently the record does not support Unum's passing contention that Burton failed to treat in a misguided attempt to defeat the Policy's preexisting condition clause. Pl.'s Brief at 11. Although it is undisputed Burton did at one time claim to a Unum specialist he had failed to treat after moving to Austin so his condition would not be "preexisting" (which may or may not have been a true statement, as Burton claims he was in a manic episode at the time), Unum never relied on the statement as a reason to deny Burton benefits. Thus, whether Burton's assertion was true or false and what his state of mind was when he made it are issues which are not germane to this appeal, and will not be considered further.

D.      **Reliance on In-House Physicians**

Finally, Burton claims Unum failed to provide Burton a full and fair appeal because the only medical professionals Unum had review his claim on appeal were in-house psychiatrists. Pl.'s Brief at 12. Burton's argument is unavailing. In *Cummins v. Unum Provident Ins. Co.*, a district court in this Circuit considered an identical claim. The *Cummins* court held "whether an administrator retains 'in-house doctors' to review claims is irrelevant in the conflicts analysis." 630 F. Supp. 2d 687, 701 (M.D. La. 2007) (citing *Davis v. Unum Life Ins. of America*, 444 F.3d 569 (7th Cir. 2006)). The Court noted "the neutrality of such physicians, even if employees of Unum, is presumed unless the claimant shows, by providing specific evidence of actual bias, that there is a significant conflict." *Id.* (citations omitted).

In this case, as in *Cummins*, the only evidence of conflict produced by Burton is that Unum relied on the opinions of physicians who were also its employees. *Id.* Burton, like the plaintiff in *Cummins*, has not presented a scintilla of evidence demonstrating those doctors "had some specific stake" in the outcome

-16-

of his case, "such as higher payment if [Burton's] claim was denied."[9]  *Id.* (citing  *Davis*,444 F.3d at 575

(finding proof of the use of in-house doctors alone is not enough to show bias; instead, a claimant must

show the doctors had some specific stake in the outcome, such as a specific financial incentive to deny

the claimant's claim)).  Because Burton has produced absolutely no evidence Unum's "in-house" doctors

had any "specific incentive to derail his claim," Unum's structural conflict of interest is not a significant

factor in assessing whether Unum abused its discretion.  *See id.*;  *McDonald v. Hartford Life Group Ins.*

*Co.*, Slip Copy, 2010 WL 183431 at *8 (5th Cir. 2010) ("If claimants do not present evidence of the

degree of the conflict, the court will generally find that any conflict is not a significant factor.").

    Burton also claims Unum's supposed conflict of interest was heightened due to Unum's history

of "biased claims administration."  The Supreme Court in *Glenn* did suggest a conflict of interest may be

more significant where the "administrator has a history of biased claims administration." 128 S.Ct. at

2351.  As an example of one such administrator, the *Glenn* court cited a law review article detailing

Unum's history of biased claims administration.  *Glenn*, 128 S.Ct. at 2351 (citing John H. Langbien, *Trust*

*Law As Regulatory Law: The UNUM/Provident Scandal and Judicial Review of Benefit Denials Under*

*ERISA*, 101 Nw.U.L.Rev. 1315, 1323-24 (2007)).  Other courts have since followed suit, taking Unum's

history of aggressive claims administration as a factor to consider in analyzing whether Unum has abused

its discretion.  *See, e.g. Chronister v. Unum Life Ins. Co. of America*, 563 F.3d 773, 776 (8th Cir. 2009)

("Unum's history of arbitrarily denying claims such as [plaintiff]'s is another factor that the Court must

consider in determining whether Unum abused its discretion in denying [plaintiff]'s claim.").  Thus, the

---

    [9]Indeed, the present case is even less compelling than *Cummins*, in which the in-house doctors
disagreed with the treating physician.  Here, the in-house psychiatrists did not disagree with any of
Burton's treating physicians (either Dr. Coates or Dr. Wakefield) because neither of them ever made
a determination about whether he was disabled in March 2007.

Court finds Unum's history of apparently unscrupulous claim denials, as recognized by the Supreme Court of the United States, is a factor to consider in determining whether Unum abused its discretion.

Nonetheless, considering all the foregoing, the Court finds neither Unum's structural conflict of interest nor its history weighs heavily against it in this case. The circumstances and the record do not suggest any real likelihood the structural conflict affected the benefits decision in this case, especially because the decision is justified on a purely objective ground: Burton was not under the care of a physician for his bipolar disorder during *any* of the time he worked for Baker Botts or immediately thereafter, and the Policy undisputedly requires the opposite. The fact Unum relied on the opinions of in-house physicians for the disability determination therefore carries little weight, as there was substantial reason for the denial of Burton's claim simply based on his lack of compliance with the clear terms of the Policy. However, Unum should consider itself warned that if this case had turned on the determinations of its in-house physicians as to whether Burton was "impaired" in March 2007, or if the opinions of the in-house physicians had in fact conflicted with an opinion (even a retroactive opinion) of one of Burton's treating physicians, Unum's conflict of interest might well have weighed far more heavily in the Court's abuse of discretion analysis, and might even have tipped the scales against Unum.

As for Unum's apparent history of biased claims administration, as acknowledged by the *Glenn* court, it is tempered by the fact that Unum has—since *Glenn*—adopted new claims-handling practices (as even Burton concedes, *see* Pl.'s Brief at 10). Unum is required to follow these practices, and it appears it did follow them in this case. Burton has not demonstrated Unum was biased in the instant case, and the Court will not assume Unum is biased every time it denies a claim merely because it has a parsimonious claims-granting history. *See Uquillas v. Unum Life Ins. Co. of Am.*, 2010 WL 330255 at ¶ 91 (C.D. Cal. 2010). Based on the foregoing, the Court finds Unum's history and structural conflict of interest do not outweigh the evidence in the record supporting its decision to deny Burton benefits.

-18-

## IV.     Conclusion

Accordingly, the Court concludes neither Unum's factual determination nor its interpretation of the Policy in this case—even when viewed with skepticism—was an abuse of discretion.  A plan administrator abuses its discretion "where the decision is not 'based on evidence, even if disputable, that clearly supports the basis for its denial.'"  *Holland*, 576 F.3d at 247 (quoting *Lain*, 279 F.3d at 342).  The evidence in this case from the physicians who personally examined Burton is, at best, inconsistent and highly inconclusive (and at worst, nonexistent) on the question of whether he was impaired due to bipolar disorder in March 2007.  But there *is* concrete evidence in the record indicating he was not under the regular care of a physician for bipolar disorder in March 2007 by informed choice; thus, there is concrete evidence he was not "impaired" under the terms of the Policy, as Unum ultimately determined.  Because the evidence is more than sufficient to support Unum's determination, Unum's conflict of interest is not a "tie-breaking factor," *Dutka ex rel. Estate of T.M. v. AIG Life Ins. Co.*, 573 F.3d 210, 213 n. 6 (5th Cir. 2009), and the Court finds Unum did not abuse its discretion in denying Burton's claim.

However, the Court notes in conclusion that the overall record in this case plainly indicates Burton suffers from bipolar disorder, and has so suffered since at least 2004.  Although the illness is episodic, and may have waned at times, it is obvious Burton has a mental illness and should have remained on medication for that illness.  The SSA, considering the exact same evidence as Unum, held Burton was totally disabled as of March 2007.  Unum has ignored this finding and denied Burton's claim.  This Court upholds Unum's determination because of the clear terms of its Policy, with which Burton was not in compliance.  Nonetheless, the Court laments the unfortunate result of this case and the fact Unum has escaped payment to a man who is clearly mentally ill by rigidly and aggressively enforcing the terms of its Policy against him, even though his non-compliance may arguably have been a symptom of his illness. However, the fix for this is not in the Court—as neither the Court nor Burton can deny he is bound by the

-19-

Policy's plain terms—but in the marketplace, where Unum's aggressive claims administration seems already to have reaped it a befitting reputation.  *See, e.g. McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 137 (2d Cir. 2008) (Unum "reveals a disturbing pattern of erroneous and arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous tactics.").

In accordance with the foregoing,

IT IS ORDERED that Defendant Unum Life Insurance Company of America's Sealed Trial Brief [#16], which the Court has construed as a motion for summary judgment, is GRANTED in full, and Plaintiff Charles William Burton's claim pursuant to 29 U.S.C. § 1132(a)(1)(B) is accordingly DENIED.

IT IS FURTHER ORDERED that the above-styled and numbered cause is hereby DISMISSED WITH PREJUDICE.

SIGNED this the 14th day of June 2010.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE